UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BENJAMIN M.,                          )        Case No. 5:16-cv-00087-JFW-KES
                                      )
                Plaintiff,            )
                                      )
        v.                            )               Final Report and
                                      )
NANCY BERRYHILL, Acting               )           Recommendation of
Commissioner of Social Security,[1]   )
                                      )        United States Magistrate Judge
                Defendant.            )
                                      )
                                      )
_____ )

     This Report and Recommendation is submitted to the Honorable John F. Walter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

---

[1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

# I.

## BACKGROUND

Plaintiff Benjamin M. ("Plaintiff") previously applied for supplemental security income ("SSI") alleging disability beginning on November 30, 2006. See Administrative Record ("AR") 40, 78. Administrative Law Judge ("ALJ") Keith Dietterle conducted three hearings. AR 54-69 (10/7/08 hearing); AR 70-75 (8/17/10 hearing); AR 78-92 (12/14/10 hearing). In a final decision dated January 14, 2011, ALJ Dietterle found that Plaintiff had the severe impairments of bilateral shoulder pain, diabetes mellitus, cervical spine disorder, and lumbar spine disorder. AR 144. The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of light work—specifically, occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand and walk for six hours and sit for six hours in an eight-hour day; occasionally perform postural activities; and occasionally lift overhead, bilaterally. AR 145. ALJ Dietterle found Plaintiff was "not disabled," because he could do his past relevant work. AR 136-49.

About a month later, on February 15, 2011, Plaintiff again applied for SSI, again alleging disability beginning November 30, 2006. See AR 40. ALJ Troy Silva convened a hearing on December 21, 2012, at which Plaintiff, who was represented by counsel, appeared and testified with the assistance of a Spanish interpreter. AR 95-135. On January 10, 2013, ALJ Silva issued a written decision denying Plaintiff's request for benefits. AR 40-49. Plaintiff timely appealed to the Appeals Council, which declined review on July 25, 2013. AR 9-11.

In October 2014, Plaintiff requested that the Appeals Council reopen the case. AR 6. In November 2015, the Appeals Council denied that request as untimely. AR 6-7. The Appeals Council nevertheless granted Plaintiff an extension of time to January 15, 2016, to appeal to the District Court. AR 1, 6. Plaintiff now appeals the January 2013 final decision of ALJ Silva.

2

## II.

## LEGAL STANDARDS

**A.    The Evaluation of Disability.**

A person is "disabled" for purposes of receiving Social Security benefits if he is unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).  A claimant for disability benefits bears the burden of producing evidence to demonstrate that he was disabled within the relevant time period.  <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995).

**B.    The Five-Step Evaluation Process.**

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n. 5 (9th Cir. 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  <u>Id.</u> §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  <u>Id.</u> §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient RFC to perform his past work; if so, the claimant is not disabled and the claim must be denied. Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. Id. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n. 5; Drouin, 966 F.2d at 1257.

**C.      Sequential SSI Applications.**

"The principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988). "Normally, an ALJ's findings that a claimant is not disabled 'creates a presumption that the claimant continued to be able to work after that date.'" Vasquez v. Astrue, 572 F.3d 586, 597 (9th Cir. 2009) (citation omitted). "The presumption does not apply, however, if there are 'changed circumstances.'" Lester, 81 F.3d at 827 (citation omitted). Examples of changed circumstances include "[a]n increase in the severity of the claimant's impairment," "a change in the claimant's age category," and a new issue raised by the claimant, "such as the existence of an impairment not considered in the previous application." Id. at 827-28 (citations omitted).

Here, ALJ Silva concluded that Plaintiff had rebutted the nondisability presumption. See AR 40. ALJ Silva did not state what changed circumstances existed, and neither party disputes this portion of the ALJ's opinion.

4

When a claimant overcomes the presumption of continuing non-disability, a prior ALJ's individual findings are still entitled to some res judicata consideration absent new information not presented to the earlier adjudicator. See Acquiescence Ruling ("AQR") 97-4(9): see also Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008) (noting that "a previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some res judicata consideration and such findings cannot be reconsidered by a subsequent judge absent new information not presented to the first judge"). As AQR 97-4(9) puts it, if the claimant rebuts the presumption,

> adjudicators then must give effect to certain findings . . . contained in the final decision by an ALJ or the Appeals Council on the prior claim, when adjudicating the subsequent claim[, including] a finding of a claimant's residual functional capacity, education, or work experience, or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, or a finding required under the evaluation process for determining disability provided under 20 CFR 404.1578, as appropriate, which was made in the final decision on the prior disability claim. Adjudicators must adopt such a finding from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

See AQR 97-4(9), available at 1997 WL 742758.

**D.    The District Court's Standard of Review.**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they

are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Parra v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. <u>Id.</u> at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006).

### III.

### SUMMARY OF THE ALJ'S DECISION

At step one, ALJ Silva found that Plaintiff had not engaged in substantial gainful activity since February 15, 2011, his second application date. AR 42.

At step two, the ALJ found that Plaintiff had the severe impairments of "degenerative disc disease of the lumbosacral spine; mild degenerative joint disease, left shoulder; diabetes mellitus; and hypertension." AR 43. The ALJ declined to find that a medically determinable impairment caused Plaintiff's neck pain. <u>Id.</u> The ALJ also declined to find that Plaintiff's right shoulder pain rose to the level of a severe impairment. <u>Id.</u> The ALJ found a lack of objective evidence to substantiate

the existence of any mental disorder causing memory loss. AR 44. While the ALJ considered how Plaintiff's obesity affected his functionality, the ALJ did not classify his obesity as a severe impairment. AR 43.

At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any impairment in the Listing. AR 44.

At step four, the ALJ found that despite his impairments, Plaintiff had the RFC to perform medium work, as defined in 20 C.F.R. § 416.967(c), with some additional limitations, as follows:

> [C]laimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently. He can stand and/or walk for six hours out of an eight-hour workday with regular breaks. He can sit for six hours out of an eight-hour workday with regular breaks. He can perform overhead lifting occasionally with the bilateral upper extremities. He can occasionally climb, balance, kneel, and crawl.

AR 44.

In assessing this RFC, the ALJ evaluated Plaintiff's testimony about the limiting effects of his impairments, including his pain, and found it "less than fully credible." AR 45. The ALJ also considered the medical evidence, including treating records, a report by examining internist Dr. Ruben Ustaris (AR 470-74), a report by examining psychologist Dr. Charlene Krieg (AR 475-80), the state agency physical medical consultants (Drs. Schwartz and Scott [AR 485 and 582]), and the state agency review psychiatrists (Drs. Balson and Morgan [AR 486 and 579-80].) AR 46-48.

Based on the assessed RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff would be able to perform his past relevant jobs of light truck driver and assembler. AR 48. Therefore, the ALJ concluded that Plaintiff was not disabled. AR 49.

/ / /

# IV.

## ISSUES PRESENTED

Plaintiff raises the following seven claims of error:

Issue No. 1: Whether the ALJ erred in failing to set forth proper hypotheticals and concluding that the Plaintiff could perform his past work and medium work;

Issue No. 2: Whether new treating physician evidence should be admitted;

Issue No. 3: Whether the ALJ committed erred by failing to give "specific clear and convincing" reasons for rejecting Plaintiff's subjective symptom testimony;

Issue No. 4: Whether the ALJ erred in finding Plaintiff's right shoulder impairment was nonsevere;

Issue No. 5: Whether Plaintiff's combined impairments meet and/or equal the severity of a listing;

Issue No. 6: Whether the ALJ erred when he found Plaintiff capable of medium work and failed to proceed to find Plaintiff disabled under the Medical-Vocational Guidelines; and

Issue No. 7: Whether this case should be reversed for the payment of benefits.

(Dkt. 51 at 2.)

Plaintiff's opening brief is at Docket 51; the Commissioner's opposition is at Docket 52; Plaintiff's reply is at Docket 51-2. Plaintiff also filed a chronological summary of the medical evidence (Dkt. 51-1) and new evidence that is the subject of Issue 2 (Dkt. 51-3).

The Court will first address the threshold issue of res judicata, followed by Issues Two and Three because they concern what evidence should be (or have been) considered when assessing Plaintiff's RFC. The Court will address the remaining

issues in an order consistent with the sequential evaluation process: Issues Four, Five, One, Six, and Seven.

## V.

## DISCUSSION

### A. Res Judicata Issue.

The Court first addresses a threshold issue raised by Plaintiff: Did the second ALJ err by failing fail to give res judicata effect to the first ALJ's RFC, which found that Plaintiff was capable of less than a full range of light work? (See Dkt. 51 at 7-9); see also AR 145 (first ALJ's RFC). The answer is "no." Chavez, 844 F.2d at 693 (holding that principles of res judicata apply to administrative decisions, though doctrine is applied less rigidly to administrative proceedings than to judicial proceedings), does not bind the second ALJ to the first ALJ's RFC finding. The second ALJ addressed a variety of new (i.e., post-January 2011) evidence material to Plaintiff's RFC during the time relevant to Plaintiff's second application. See AR 43 (second ALJ citing June 2011 diagnostic imaging of cervical spine and right shoulder revealing mild or normal findings and full range of motion during consultative examination); AR 46-47 (discussing February and June 2011 unremarkable findings on physical examinations for lower back pain and shoulder pain, as well as June 2011 diagnostic scans); AR 47 (citing April 20111 records reflecting generally normal neurological and cardiac findings); AR 47-48 (citing June 2011 complete consultative internal medicine evaluation by Dr. Ustaris, opining that Plaintiff could perform medium work); AR 98 (noting at hearing that portions of first ALJ's RFC were no longer supported due to new diagnostic studies). The second ALJ did not err in this regard. See Stubbs-Danielson, 539 F.3d at 1173 ("Stubbs-Danielson has not established that the ALJ improperly reconsidered prior findings, i.e., reconsidered prior findings based strictly on information already presented to the first judge. The entirety of the medical evaluations presented with respect to the present application were conducted after Stubbs–Danielson's 1984

9

initial disability determination.  These evaluations necessarily presented new and material information not presented to the first ALJ."); <u>Herbert v. Colvin</u>, No. 13-01888, 2014 WL 4956448, at *4–5 (D. Or. Oct. 1, 2014) (affirming second ALJ's removing postural limitations set out in first ALJ's RFC, because record contained sufficient new and material evidence related to Plaintiff's RFC to permit second ALJ to "redetermine" Plaintiff's RFC).

**B.    ISSUE TWO: New Evidence.**

    **1.    Rules Governing Remand to Consider New Evidence.**

A claimant may ask the district court to remand the case to permit the ALJ to consider new evidence.  Remand is appropriate if (1) the new evidence is "material" and (2) there is "good cause" for the failure to incorporate such evidence into the record in prior administrative proceedings.  <u>Burton v. Heckler</u>, 724 F.2d 1415, 1417 (9th Cir. 1984) (citing 42 U.S.C. § 405(g)).

"To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier."  <u>Mayes v. Massanari</u>, 276 F.3d 453, 463 (9th Cir. 2001); <u>see also</u> <u>Key v. Heckler</u>, 754 F.2d 1545, 1551 (9th Cir. 1985) ("If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied.").

To be material, the new evidence must bear "directly and substantially on the matter in dispute."  <u>Mayes</u>, 276 F.3d at 462 (holding no remand required where claimant failed to demonstrate that "the [back] condition diagnosed in November 1997 [and discussed in the new evidence] even existed when the ALJ hearing was held in May 1997").  This means it must be probative of the claimant's condition at or before the time of the disability hearing.  <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d 509, 511 (9th Cir. 1988) (citing 20 C.F.R. § 404.970(b)) (holding evidence of "mental deterioration after the hearing … would be material to a new application, but not probative of his condition at the hearing").  Finally,

materiality also requires claimants to "demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing." <u>Mayes</u>, 276 F.3d at 463.

### 2. Summary of Plaintiff's New Evidence.

Plaintiff submits the following two documents as new evidence:

• A 9/26/15 Physical Residual Functional Capacity Questionnaire ("RFC Questionnaire") completed by Dr. Antonio Llamas of Clínica Médica Familiar. (Dkt. 51-3 at 2-6.) The form indicates that its completion was requested by Plaintiff's counsel in 2015. (<u>Id.</u> at 2.) When asked to state the "frequency and length of contact with patient," Dr. Llamas stated, "Twice per month" without identifying how long he has seen Plaintiff with that frequency. (<u>Id.</u>)

• A 12/20/15 letter from Dr. Llamas expressing opinions about Plaintiff's exertional RFC and mental limitations. (<u>Id.</u> at 7.) Plaintiff states that Dr. Llamas has treated him "for about ten years." (Dkt. 51 at 11.) In 2009, Dr. Llamas wrote a letter explaining that Plaintiff had been a patient of Clínica Médica Familiar since 2001. AR 624.

### 3. Analysis of Good Cause and Materiality.

Plaintiff asserts that "good cause exists for failure to admit the evidence sooner," but he fails to explain this assertion. (Dkt. 51 at 13.) The Court presumes Plaintiff means that these opinions were not available until 2015 when Dr. Llamas wrote them. Given Plaintiff's long-standing treating relationship with Dr. Llamas, Plaintiff has not explained why he did not obtain any RFC-related opinions from Dr. Llamas after his February 2011 application but before ALJ Silva's December 2012 hearing. Plaintiff's lack of any explanation is striking because (1) Dr. Llamas wrote earlier opinion letters in 2009 (<u>see</u> AR 622 and 648) and (2) the RFC Questionnaire indicates that counsel did not ask Dr. Llamas to complete it until 2015. (Dkt. 51-3 at 2.) Plaintiff thus fails to show good cause for not including post-2009 evidence from Dr. Llamas in the administrative record.

Plaintiff next argues that Dr. Llamas's 2015 opinions are material, "because [Plaintiff's] treating physician opines that he is disabled, which would provide a reasonable basis for changing the outcome of the case." (Id. at 14.) Plaintiff does not explain why Dr. Llamas's 2015 opinions – written long after the ALJ's January 2013 decision – are probative of Plaintiff's condition at or before the time of the hearing. Nothing in the RFC Questionnaire or letter indicates that Dr. Llamas was offering retrospective opinions about Plaintiff's condition in 2012 or 2013. To the contrary, both are written in the present tense. Plaintiff thus fails to show that the 2015 opinions are material to the relevant time period.

For these reasons, remand is not required to permit the ALJ to consider Plaintiff's new evidence.

## C.     ISSUE THREE: Subjective Symptom Testimony.

### 1.     Rules for Evaluating Subjective Symptom Testimony.

An ALJ's assessment of a claimant's testimony concerning his or her pain level is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).

If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas, 278 F.3d at 958. If the ALJ's credibility finding is supported by substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must

determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

Here, the ALJ issued his decision in January 2013. At that time, Social Security Ruling ("SSR") 96-7p had not been superseded by SSR 16-3p (which superseded SSR 96-7p on March 28, 2016). The Court notes that the SSR changes appear immaterial to the ALJ's analysis in this case. Both SSRs note that, in assessing a claimant's subjective symptom testimony, ALJs should consider, in addition to the objective medical evidence: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. Compare SSR 96-7p, 1996 WL 374186, and SSR 16-3p, 2017 WL 5180304; see

also 20 CFR § 404.1529 (effective to March 26, 2017, reflecting same factors); see also Clowser v. Berryhill, No. 16-2044, 2017 WL 5905506, at *3 (C.D. Cal. Nov. 30, 2017) ("When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision.").

### 2. Plaintiff's Subjective Symptom Testimony and the ALJ's Reasons for Discounting It.

Plaintiff testified that he "always" has back pain. AR 115. He cannot sit in one place without pain, that if he does sit, it will "hurt a lot," that it will start hurting in "[a]round 10 minutes" and then he must get up and walk for about "three to five minutes." AR 116. Plaintiff also testified that he can only sit about an hour and stand about 15-20 minutes before he starts to experience numbness. AR 110-11. Both sitting and standing can trigger numbness, and he experienced that "sometimes two to three times in a day." Id. He testified that he experiences chest pain "around two times a day." AR 116.

The ALJ discounted Plaintiff's pain testimony for at least six reasons: (1) conservative treatment, (2) work during the claimed period of disability, (3) inconsistent statements about prior employment, (4) suboptimal effort during a psychological evaluation, (5) non-compliance with recommended treatment, and (6) lack of supporting objective medical evidence. AR 45-47. Because lack of supporting objective medical evidence is insufficient by itself to discount pain testimony, the Court will consider ALJ Silva's other reasons.

#### a. Reason One: Conservative Treatment.

An ALJ may discount a claimant's testimony regarding the severity of an impairment where the claimant has received conservative treatment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (ALJ properly discredited testimony of disabling pain that was "treated with an over-the-counter pain medication"). Regarding the conservative nature of Plaintiff's treatment, the ALJ found as follows:

14

Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature. The claimant never received treatment from a specialist despite complaints of disabling back pain, shoulder pain, and left-sided weakness. The claimant was referred to physical therapy [AR 826]; however, it is unclear if he followed this recommendation as there are no physical therapy treatment notes in the record. Also, the claimant's doctors did not recommend surgical intervention for his orthopedic complaints. This, the credibility of the claimant's allegations regarding the severity of his symptoms and limitations is diminished ......

AR 45.

Plaintiff argues that receiving only conservative treatment for his diabetes does not diminish the plausibility of his suffering from diabetes-related disabilities, because "the only current treatment for diabetes is conservative treatment consisting of doctor visits for blood sugar checks and medications." (Dkt. 51 at 21.) While this is true, the ALJ specifically limited his comment that Plaintiff received no recommendations for surgery to Plaintiff's "orthopedic complaints." AR 45.

Plaintiff next argues that he never received treatment from a pain management specialist because he "is a poverty patient," not because his symptoms did not warrant such a referral. (Dkt. 51 at 23, citing AR 613 [2007 record noting that Plaintiff was "filing up a paper for M[edi]-Cal"].) Plaintiff, however, does not cite to any records indicating that he ever discussed specialized pain management with his treating doctors or that a referral for specialized pain management was unavailable to him as a Medi-Cal patient. Other medical referrals evidently were. See AR 692-93 (2012 referral for physical therapy); AR 669 (2012 note "recommend refer to outpt DM [diabetes management] class if pt willing"); AR 747 (2012 note "referred to diabetic and family clinic"); AR 832 (2012 "referred to nutritionist – pt

15

to schedule"); AR 651 (2011 referral for "outpt cardiac stress test"); AR 702 (2012 referral to "la clínica de urologia y del ojos" [urology and eye clinic].)

Finally, Plaintiff argues that his treatment has not been conservative because he had right shoulder surgery (citing AR 649) and four recent hospitalizations (citing AR 651, 411, 399, 578, 679, 692). (Dkt. 51 at 20.) AR 649 is a 2009 record referring to "eight years history of right shoulder pain" with "surgery seven years ago," i.e., in 2002, long before the time period relevant for Plaintiff's instant SSI application.

According to Plaintiff's summary of the medical evidence, the four hospitalizations referenced in his brief occurred on 4/6/11, 4/25/11, 6/6/11, and 5/17/12. (Dkt. 51-2 at 6-8, 13.) The cited records and other records relevant to Plaintiff's treatment for pain during these years provide the following information:

• 4/6/11: Plaintiff was hospitalized for a transient ischemic attack ("TIA"), i.e., a temporary blockage of blood flow to the brain similar to a stroke. AR 651. He spent four days in the hospital. AR 411.

• 4/25/11: Plaintiff visited the emergency room ("ER") complaining of left side weakness and numbness; intake notes state he "had same problem" 10 days ago, referring to the TIA. AR 411, 415. He was discharged home after several hours. AR 415. His only medications at the time were for diabetes and circulatory system conditions. AR 419, 423.

• 6/6/11: Plaintiff visited the ER visit complaining of "4 months" of left side weakness and "chronic pain back and shoulder." AR 399. The intake staff noted he was "Wanting pain meds." Id. Plaintiff complained of "subjective feeling of weakness on [left] side of body," but the ER staff who examined him observed "No deficits on exam." AR 400. Plaintiff was "ambulatory" with a "steady gait." AR 402. Plaintiff was advised to "go to clinic for further pain meds." AR 400; see also AR 564 (advising same thing in Spanish).

• 4/1/12: Plaintiff had no prescribed pain medication. AR 770.

• 5/7/12: Plaintiff went to the clinic which recommended he take "Naprosyn

16

over the counter for muscle pain." AR 832.

    • 5/17/12: Plaintiff was hospitalized for "chest pain; dizziness." AR 661. On arrival, he could ambulate with assistance. Id. His listed medications did not include any pain medication other than aspirin (which may have been prescribed as a blood thinner). AR 671, 674. He was discharged home on 5/19/12. AR 679.

    • 6/01/12: Plaintiff visited the ER complaining of "chronic back pain but today is worse." AR 776. Plaintiff received new, non-refillable prescriptions for Vicodin and Baclofen, a muscle relaxant. AR 771-72, 777-78.

    • 7/16/12: Plaintiff visited the ER complaining again of back and neck pain. AR 793. He received another Vicodin prescription to take "as need" for "severe pain." AR 796-97.

    • 7/28/12: Plaintiff visited the ER complaining of a toothache and earache. AR 798. Upon discharge, he was instructed, "Follow up with a dentist. Finish all antibiotics. Do not drive when taking Vicodin." AR 805.

    • 8/20/12: ER visit notes state, "here for physical." AR 817. Plaintiff's medications at that time did not include Vicodin, but did include Tramadol for "mod-severe pain." AR 822-23.

    • 9/5/12: Per notes from a "Physical Assessment," Plaintiff was referred to physical therapy and instructed to "continue pain meds." AR 826. Plaintiff was given a follow-up appointment in two weeks and instructed to "bring all meds to review." AR 826. There are no physical therapy in the administrative record.

    • 12/21/12: At the hearing, Plaintiff remembered he was taking Naprosyn, but he could not remember any other pain medications. AR 118.

    These records show multiple ER visits, but only two hospitalizations. Plaintiff cannot point to his own decisions to visit the ER for primary healthcare as evidence that he received more than conservative treatment. See AR 119 (Plaintiff testified that he goes to the emergency room "[a]round five times a month" because his "main doctor in Corona he will give him very long appointments.") The first

hospitalization involved a TIA unrelated to Plaintiff's spinal/joint impairments, and only about a month later, ER staff saw "No deficits" upon performing a physical examination. AR 400. The second hospitalization occurred after Plaintiff went to the ER complaining of chest pain, but ER records state that he was admitted to the hospital because of his diabetes, i.e., his A1C was too high. AR 672, 679. Plaintiff had complained of chest pain as far back as 2007 (AR 608), but an echocardiogram in 2011 documented only mild cardiac abnormalities. AR 388.

Regarding pain management, the above-summarized medical records show that from the date of his relevant SSI application (February 2011) through June 2012, Plaintiff had only received over-the-counter pain medicine, Naprosyn. For about a month between June and July 2012 he was prescribed Vicodin and then Tramadol in August 2012. AR 771-72, 777-78, 796-97, 822-23. By December 2012, he only remembered taking Naprosyn for pain. AR 118. The ALJ properly characterized this minimal use of prescription pain medication (unaccompanied by recommendations for surgery, completed courses of physical therapy, or a referral for specialized pain management services) as conservative pain management. See Ferguson v. Berryhill, No. 16-02186, 2017 U.S. Dist. LEXIS 105493, at *11 (C.D. Cal. July 7, 2017) (upholding ALJ's rejecting of Plaintiff's testimony where plaintiff received conservative, effective treatment, which included narcotic medication); Wallace v. Berryhill, No. 16-02064, 2017 U.S. Dist. LEXIS 141354, at *15 (C.D. Cal. Aug. 31, 2017) (upholding ALJ's rejection of physician's opinion as inconsistent with "conservative" treatment where claimant took Tramadol for years); Kelly v. Colvin, 15-06154, 2016 U.S. Dist. Lexis 124261, at *11 (C.D. Cal. Sept. 13, 2016) (upholding ALJ's determination that treating consisting of "physical therapy and medications such as Tramadol, Naproxen, Ultram, Hydrocodone, and Ibuprofen" was conservative); Medel v. Colvin, 13-2052, 2014 U.S. Dist. LEXIS 159933, at *27 (C.D. Cal. Nov. 13, 2014) (affirming ALJ's characterization of claimant's treatment as conservative where he had been "prescribed only Vicodin

18

and Tylenol for his allegedly debilitating low-back pain"); Morris v. Colvin, 13-6236, 2014 U.S. Dist. LEXIS 77782, at *12 (C.D. Cal. June 3, 2014) (finding that ALJ permissibly discounted plaintiff's credibility in part because plaintiff received conservative treatment consisting of use of TENS unit and Vicodin); Walter v. Astrue, 09-1569, 2011 U.S. Dist. LEXIS 38179, at *9 (C.D. Cal. Apr. 6, 2011) (finding that ALJ permissibly discounted claimant's credibility based on conservative treatment, which included Vicodin, physical therapy, and a single injection).

        b.    Reason Two: Work During Period of Claimed Disability.

The ability to perform part-time work is a factor the ALJ may consider in assessing credibility. See, e.g., Bray v. Comm'r of SSA, 554 F.3d 1219, 1227 (9th Cir. 2009) (affirming claimant not credible because she "recently worked as a personal caregiver for two years, and has sought other employment since then"); Merritt v. Colvin, 572 F. App'x 468, 470-71 (9th Cir. 2014) (concluding claimant's interest in starting new job was clear and convincing reason in support of an ALJ's adverse credibility determination); Foster v. Astrue, 2012 U.S. Dist. LEXIS 8859, at *30-31 (C.D. Cal. Jan. 23, 2012) (finding claimant was not credible because she worked part-time at Subway).

Here, in evaluating Plaintiff's testimony, the ALJ pointed out that Plaintiff "testified that he last worked as a driver for four months around 2006 or 2007. He explained that he was fired from this job because he could not lift heavy objects." AR 45. ALJ Silva found that Plaintiff made $8,000 in 2006 and that his work driving for the furniture store was substantial gainful employment. AR 121-22.

Plaintiff argues that this does not show he could work during the period he claimed disability. "[T]he ALJ mischaracterizes the job as if [Plaintiff] were lifting 'heavy objects' (AR 45) when [Plaintiff] was only capable of driving the truck, engaged in no lifting, and was fired when he attempted and could not lift a china dishes [sic]." (JS at 51.)

19

Plaintiff testified that he was a driver for a furniture store for four months, and "then he was fired because he couldn't lift anything heavy." AR 101-02. He explained that as a driver, he "didn't have to lift anything," but "once he was in the factory, he had to help."[2] AR 102. Sometimes he would carry tools in the factory to help the workers assembling the furniture, and he could carry a standard hammer. AR 123-24. In the factory, "even lifting china, he had to lift it and he couldn't. And they let him go." AR 102. That was the first and only time the furniture store asked him to lift something heavy. AR 124. The record does not state whether the china Plaintiff could not lift was a box of china, a stack of china, or one china dish, but Plaintiff repeatedly referred to the china as "heavy." Id.

Thus, the ALJ did not mischaracterize Plaintiff's testimony; as the ALJ noted, Plaintiff testified that the furniture store fired him because he could not lift heavy china. The ALJ was permitted to discount Plaintiff's subjective symptom testimony based on Plaintiff's ability to sustain four months of substantial gainful employment during a period when he claimed disability through his earlier application.

c.    Reason Three: Inconsistent Statements.

At the first hearing, before ALJ Dietterle, Plaintiff testified that he had not worked since 2001. AR 59. When ALJ Dietterle asked him about a work background sheet that he had completed, Plaintiff admitted that he worked from March to November 2007 as a driver. AR 59-60. Plaintiff explained that he had not told ALJ Dietterle about that work after 2001 because "they told me they had not reported it." AR 60. ALJ Dietterle then referred to records showing Plaintiff had earnings in 2005, earned $46,000 in 2006, and earned $63,000 in 2007. AR 60-61. The earnings were for work at Juan's Universal Corporation, which Plaintiff had indicated was the company that employed him as a driver. AR 60. Plaintiff disputed

---

[2] At an earlier hearing, Plaintiff testified that when he worked as a driver in 2007, he did not have to lift anything. AR 66.

the accuracy of those records, saying, "I have not worked." AR 61. He had "no idea" why Juan's Universal Corporation had reported that he was making money there. Id.

The third hearing before ALJ Dietterle was conducted after remand from the Appeals Council. AR 78. The Appeals Council "indicated that the ALJ will recompute the date last insured in this matter as earnings have been removed from the claimant's record; determine if the claimant has engaged in any SGA [substantial gainful activity]; and continue with the sequential evaluation process." AR 78-79. It is unclear what earnings were removed.[3]

At this hearing, Plaintiff again testified that he last worked in 2001 at a scissors factory. AR 81. He later added that he worked at a furniture factory for about four months putting together furniture. AR 82. He testified that he "was not able to continue doing it due to [his] illness." Id. He testified that the furniture job required him to "lift very little," and the "majority of the time" he was doing assembly.[4] Id. He testified that his condition has gotten worse since 2006. AR 84.

---

[3] The Court requested that the Commissioner augment the administrative record by including records that would have shown what earnings were removed. (See Dkt. 53.) The Commissioner refused, arguing that the Court had no jurisdiction to "consider" those items. (See Dkt. 56.) Where a later ALJ discusses or relies upon exhibits or decisions related to previous ALJ decisions on the same applications, part of reviewing that later ALJ decision presumably would involve seeing those exhibits or decisions. Even if the later decision did not rely on certain records, in a case like this one with a complex procedural history, the records would have been helpful to the Court. The Commissioner should have simultaneously argued that the Court cannot consider those documents in its analysis while providing the records in response to the Court's order. Nonetheless, in the present case, these matters do not affect the Court's analysis

[4] Later, Plaintiff testified that he was a driver for a furniture store for four months and "was fired because he couldn't lift anything heavy." AR 101-02. He testified that he "didn't assemble furniture," but sometimes he would carry tools in the factory to help the workers who did assemble furniture. AR 123-24.

Regarding his driving ability, he testified that in 2006 he could drive, but "only five miles, four miles. But now [in December 2010] nothing." Id.

At the fourth hearing in December 2012 (i.e., the first hearing before ALJ Silva), Plaintiff again testified that since 2001, he had only worked for four months as a driver, either in 2006 or 2007. AR 101-02. He testified that he was never self-employed. AR 102-03. ALJ Silva told Plaintiff's counsel that he perceived a "big issue" with "credibility" because of the additional years of documented earnings (i.e., 2005 and 2006) that are inconsistent with working as a driver for four months in 2007. AR 104. Plaintiff's counsel suggested that Plaintiff may not understand the meaning of "self-employed" and asked some clarifying questions. AR 104-05. Plaintiff's responses indicated that he considered "self-employment" to mean owning his own company. AR 105. The ALJ then explained, "self-employed means working for yourself, not somebody else. You go out and get your own jobs." AR 105. Plaintiff testified that he had never done that. AR 106. He always worked for a company. AR 107.

Later in the hearing, ALJ Silva referred to Exhibit 1A, page 10, which is the prior ALJ's decision denying benefits after the third hearing. AR 120, citing AR 145. That decision states as follows:

> In a Disability Adult Report undated in Exhibit B5E, the claimant
> alleged onset date of November 30, 2006, and this was confirmed at the
> hearing. Disability Report from Field Office dated January 11, 2007,
> also confirmed that the claimant's alleged onset date was November 30,
> 2006 (Ex. B6E[5]). In this report, it was noted that the claimant started
> the interview lying about when he stopped working. When he was first

---

[5] Exhibit 6E in the current record (AR 294-300) is not the document referenced by ALJ Dietterle in 2010, because it references events in 2011. AR 294; (see also n.3, supra).

asked, through the interpreter, he said he stopped working several years ago, approximately in 2002. An interpreter told the claimant that there are wages for him reported for 2005, but his next answer was that he stopped working in November of 2005. When the interviewer from SSA searched the records and told him that there are estimated earnings of only $2,000 in 2006, he said he only guessed. However, later on, he admitted to earnings of $8,000 in 2006 and just as much as he did in 2005.

AR 145.[6]

ALJ Silva asked Plaintiff's counsel about this, and he explained that due to Plaintiff's low IQ, he "doesn't remember things very well." AR 121. Plaintiff's counsel confirmed that the prior ALJ decision was not appealed, and he agreed that ALJ Silva could consider the information in the above-quoted paragraph as Plaintiff's "admission that he made that much money" in 2006. AR 122.

Regarding these inconsistencies, ALJ Silva found as follows:

The claimant has also provided conflicting information regarding past work. At the hearing, the clamant testified that he has never been self-employed. The claimant repeatedly stated that he was never self-employed even after I clarified the meaning of the term. However, the prior ALJ decision includes an admission by the claimant that he was still self-employed in 2006. (AR 145.) The claimant admitted to earnings of $8,000.00 in that year.[7] The inconsistent information

---

[6] The Court has no opinion as to whether ALJ Dietterle correctly interpreted this report because the government refused to provide it.

[7] Plaintiff does not dispute the ALJ's finding of inconsistency, although the Court is unable to determine definitively whether the ALJ's finding is supported (see n.3, supra).

provided by the claimant casts doubt on the credibility of his allegations.

AR 45.

Plaintiff argues that the ALJ should not have cited his inconsistent statements as a reason to discount his testimony because he "is uneducated (AR 270), does not speak English, may be borderline intellectually functioning (AR 475-80, 121), is very forgetful, confused (AR 86, 301), and has suffered strokes[8] due to his very long-term uncontrolled diabetes." (Dkt. 51-2 at 27.) In other words, Plaintiff does not argue that his testimony about his employment since 2001 is consistent or credible; he argues instead that he should not be faulted for making inconsistent statements.

The ALJ's evaluation of a claimant's subjective symptom testimony is not about assigning fault; it is about considering whether there are clear and convincing reasons to believe that the claimant is overstating the limiting effects of his symptoms. The ALJ's finding that Plaintiff made inconsistent statements about his past employment is supported by substantial evidence. He testified he had not worked since 2001, but when confronted with records, he changed his testimony to admit later work. AR 59-60. He testified that he had intentionally not admitted his later work because he thought his employer had not reported it. Id. He said he spent most of his time assembling furniture, then said he did not assemble furniture. AR 82, 123-24. He said he could only drive four or five miles in 2006, then said he was employed primarily as a driver in 2006 or 2007. AR 84, 59-60, 101-02. These inconsistencies provide a clear and convincing reason for disbelieving Plaintiff's other statements about the limiting effects of his symptoms.

d. <u>Reason Four</u>: Suboptimal Effort During Testing.

1. Summary of Dr. Krieg's Report.

---

[8] Plaintiff did not provide a citation for evidence that he suffered strokes; the Court presumes he is referring to the TIA event. AR 651.

On June 30, 2011, Dr. Krieg performed a psychological evaluation. AR 475-80. Using an interpreter, she took a patient history and found Plaintiff a "fair historian." AR 475. She observed, "He was moderately to minimally cooperative and did not appear to be putting forth his best effort." Id. "His attitude was one of disinterest in the task at hand." AR 479. He told Dr. Krieg that he last worked as an assembler in 2000. AR 476. He told her that he had a valid driver's license and could drive, but he no longer drove alone. AR 477. Dr. Krieg administered several tests with the following results:

• Bender-Gestalt-II: "The test consists of nine index cards picturing different geometric designs. The cards are presented individually and test subjects are asked to redraw each one from memory before the next card is shown. Test results are scored based on the accuracy and organization of the reproductions." See https://en.wikipedia.org/wiki/Bender-Gestalt_Test. Plaintiff scored 11, while the standard score is 55. AR 478.

• Trail Making Test A and B: This test involves drawing a line to connect numbered dots. Plaintiff was "unable to complete." AR 478.

• Weschler Adult Intelligence Scale – IV: Plaintiff's full-scale IQ test score was 60. AR 478. This score placed Plaintiff in the bottom 0.4%.[9] Id.

• Weschler Memory Scale: Plaintiff generally scored in the "mild mental retarded range" on this test. AR 478.

Dr. Krieg concluded that these test results were "not consistent with his self-reported functioning. It is unlikely that an individual with an IQ of 60 would be able to pass the licensing exam and operate a motor vehicle." AR 479. She ultimately opined that Plaintiff "did not evidence any disorder on mental status" and has "no mental impairment that would limit his ability to engage in work activities …." Id.

---

[9] As a further point of reference, an IQ score of 70 is the "accepted level for intellectual disability." Hall v. Florida, __ U.S. __, 134 S. Ct. 1986, 2003 (2014).

25

2.  The ALJ's Analysis.

Lack of cooperation or "poor effort" during consultative examinations may support an adverse credibility determination.  See Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).  The ALJ found, "The claimant's failure to put forth maximal effort during the consultative examination suggests that much of what the claimant has alleged may be similarly unreliable," citing Dr. Krieg's report as support.  AR 46.

Plaintiff argues that Dr. Krieg erred in opining that Plaintiff's very low test scores were the result of suboptimal effort, and that "a careful reading of the record leads to the probable conclusion that Plaintiff *does* suffer borderline intellectual functioning as his sixth-grade education (AR 59, 81, 88) indicates." (Dkt. 51 at 25.)

A sixth-grade education is not evidence of a low IQ, and Plaintiff's self-reported activities (e.g., being able to drive for the furniture store) are inconsistent with his test results.  The ALJ was entitled to rely on Dr. Krieg's medical opinions, and they furnish another clear and convincing reason for discounting Plaintiff's subjective symptom testimony.

e.      Reason Five: Lack of Compliance with Treatment.

A claimant's decision not to follow or receive recommended treatment can be considered in assessing subjective symptom testimony.  See 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled[.]"); Molina, 674 F.3d at 1113 ("We have long held that, in assessing a claimant's credibility, the ALJ may proper rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."); Satter v. Colvin, 2016 WL 1226621, at *4 (D. Idaho Mar. 28, 2016) ("[T]he fact that Petitioner may not have followed his medical providers' treatment protocols does not mean ipso facto that he is not entitled to disability benefits; rather, such a circumstance is excused when the reason for not doing so is justified.").

In addition to noting that no records showed that Plaintiff pursued physical

therapy after his doctors recommended it (AR 45), the ALJ also found as follows:

> The claimant's diabetes related symptoms may be a result of medication noncompliance [AR 832]. The claimant resumed Metformin in May 2012 after a period of noncompliance. The record also indicates that the claimant refused diet education recommendations [AR 669.] The claimant's failure to follow treatment recommendations suggests that the claimant is unwilling to do that which is necessary to improve his condition. It may also be an indication that his symptoms are not as severe as he purports.

AR 47.

The record at AR 832 is dated May 7, 2012, and states Plaintiff is "following up with lab results." AR 832. It also says, "Self dc'd [discontinued] Metformin and didn't use the Humalog [insulin lispro]." Plaintiff was told to "resume Metformin," continue taking Lantus, increase Novolog [insulin aspart] at largest meal, and find a diabetes class near his home in Corona. Id. He was also instructed to schedule an appointment with a nutritionist. Id.; see also AR 703 (ER record "You were seen today because you have run out of your medication. … In the future, make contact with your own doctor to any additional refills.")

The cited AR 669 is an "Adult Initial Nutritional Assessment" completed just ten days later when Plaintiff was admitted to the hospital on May 17, 2012, complaining of chest pain. It states Plaintiff has "uncontrolled DM [diabetes mellitus]" and his "A1C = 12%." AR 669. Under "Recommendations," the hospital dietician wrote, "(1) Recommend refer to outpt DM class if pt willing; (2) Recommend 1800 [calorie] diet; (3) Diet education refused." Id. At the time, Plaintiff was taking Lantus for diabetes, but not Metformin. AR 671.

Plaintiff first argues he should not be penalized for lack of treatment when he does "not have any money or insurance" to go to the doctor, and could not even afford "strips to test [his] diabetes." (Dkt. 51 at 23, citing AR 296 [Plaintiff's own

27

statement to SSA: "I do not have any money or insurance to go and a doctor or to buy any strips to test diabetes."] and AR 301 [Plaintiff's own statement to SSA that he "is very forgetful, forgets to take his medication"].)

First, there is no evidence that Plaintiff lacks access to doctors or diabetic test strips. Dr. Llamas has been treating Plaintiff since 2001 and sees him twice per month. AR 624; Dkt. 51-3 at 2-6. Plaintiff goes to the ER frequently and has access to Medi-Cal and a clinic run by the Riverside County Department of Health. AR 119, 613.

Second, the ALJ was entitled to discount Plaintiff's own statement that he did not take recommended medicine because he was too "forgetful" and instead accept Dr. Krieg's opinion that Plaintiff failed to use appropriate effort on a memory test and has "no mental impairment that would limit his ability to engage in work activities …." AR 479.

Third, Plaintiff argues that his refusal of the hospital's offered "diet education" is not a clear and convincing reason to discount his subjective symptom testimony because, as a non-English speaker, he likely did not understand the offer, and there is no evidence that following diet recommendations in 2012 would have improved his condition. (Dkt. 51-2 at 26.) Plaintiff does not address the evidence that he voluntarily stopped taking Metformin, was instructed to resume taking it, and was hospitalized ten days later with extremely high blood sugar without having resumed taking Metformin. Plaintiff also does not address the evidence that he was referred for physical therapy but never pursued physical therapy. See AR 826. This supports the ALJ's finding that Plaintiff was not taking available opportunities to improve his condition, a fact that tends to suggest his condition was not as impaired as he alleges.

**D.    ISSUE FOUR: The Severity of Plaintiff's Right Shoulder Impairment.**

**1.    Rules Governing the Identification of Severe Impairments.**

Step two requires the Commissioner to determine whether the claimant has

any severe medically determinable impairments.  A "medically determinable impairment" exists where "medical signs and laboratory findings … show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged…." 20 C.F.R. § 416.929(a).

Once a claimant has shown that he suffers from a medically determinable impairment, he next has the burden of proving that these impairments are "severe." Edlund v. Massanari, 2001 U.S. App. LEXIS 17960, at * 23 (9th Cir. Aug. 9, 2001). An impairment is "severe" if it significantly limits a claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 416.920(c).  Basic work activities are the abilities and aptitudes necessary to do most jobs.  20 C.F.R. § 416.921(b).  Examples of physical work activities include walking, standing, sitting, reaching and carrying.  Id.  A severe impairment is one that has "more than a minimal effect on the individual's ability to do work."  SSR 96-2p.  Conversely, an impairment is "non-severe" if it does not significantly limit a claimant's ability to perform basic work activities.  20 C.F.R. § 416.921(a).  If a claimant does not have a medically determinable impairment that is "severe" over a period of at least twelve consecutive months, then the claimant is not disabled.  20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.

If an ALJ accounts for all the limitations caused by an impairment in the assessed RFC, then the ALJ's failure to label that impairment "severe," even if erroneous, is harmless error.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (holding that any error to list a condition as severe was harmless because the ALJ considered the condition when assessing the claimant's limitations).

## 2.    Summary of the ALJ's Reasoning.

The ALJ gave the following reasons for finding joint disease affecting Plaintiff's right shoulder a non-severe impairment:

As for the claimant's degenerative joint disease of the right shoulder,
the record reveals that this condition causes only a slight abnormality

that would have no more than a minimal effect on his ability to work. … Diagnostic scans of the claimant's right shoulder preformed in 2009 revealed only mild degenerative changes at the acromioclavicular joint and mild high riding humeralal head. (AR 649.) The record does not contain any recent diagnostic scans. The internal medicine consultative examination performed on June 14, 2011, revealed no problems with the claimant's right shoulder. (AR 472.) Accordingly, I find the claimant's medically determinable impairment of degenerative joint disease of the right shoulder is nonsevere.

AR 43. In the assessed RFC, the ALJ nevertheless limited Plaintiff's overhead lifting with both arms to "occasionally." AR 44.

### 3. Analysis of Claimed Error.

Plaintiff primarily cites his own testimony about right shoulder pain as the reason why the ALJ should have found degenerative joint disease affecting his right shoulder a severe impairment. (Dkt. 51 at 28-29.) For the reasons discussed above, the ALJ was entitled to discount Plaintiff's testimony.

In February 2009, Dr. Llamas diagnosed Plaintiff with "right shoulder strain." AR 622. He opined that pain caused by the strain was exacerbated by Plaintiff's earlier surgery on his right shoulder. Id. He estimated that Plaintiff could return to his customary work by April 2009. Id. He ordered a CT scan of Plaintiff's right shoulder that was done in March 2009, and it revealed "mild degenerative changes." AR 649. Nothing in the record shows that Dr. Llamas ever ordered another scan of Plaintiff's right shoulder. In June 2011, Dr. Ustaris noted that Plaintiff experienced pain upon moving his left shoulder, but Dr. Ustaris said nothing about Plaintiff's right shoulder. AR 472.

The medical evidence in the preceding paragraph supports the ALJ's finding that Plaintiff's right shoulder pain in 2011 and 2012 was not the result of a medically determinable severe impairment.

30

## E.  ISSUE FIVE: The Listings.

The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled Listings 1.02, 1.04, 4.04, and 9.0.  AR 44.

Plaintiff argues that he met some aspect of Listing 9.00 (endocrine disorders) and Listing 11.00 (neurological disorders).  (Dkt. 51 at 31, 34.)  Plaintiff does not, however, set forth the elements of these listings with a citation to authority and then cite evidence from the administrative record that he contends shows he satisfied each element.  In opposition, Defendant states that she "cannot understand" Plaintiff's Issue Five and thus "cannot formulate a response."  (Dkt. 52 at 34.)  Plaintiff declined to provide more support for Issue Five in his reply.  (Dkt. 51-2 [not discussing Listings].)

A claim of error not raised by an SSI claimant in the opening brief to the district court is waived.  Alvernaz v. Berryhill, 2018 U.S. Dist. LEXIS 40203, at *19 (E.D. Cal. Mar. 12, 2018); Figueroa v. Berryhill, No. ED CV 17-0026-KS, 2018 U.S. Dist. LEXIS 79448, at *11 n.3 (C.D. Cal. May 10, 2018).  The result is no different when a claim of error is nominally raised but lacks intelligible supporting briefing.  See Singh v. Ashcroft, 361 F.3d 1152, 1157 (9th Cir. 2004) (finding waiver where petitioner failed to express "what he considers to be the factual and/or legal inadequacies of the IJ's challenged decision"]; Phuong Doan v. Astrue, 464 F. App'x 643, 645 (9th Cir. 2011) ("[A]rguments 'not coherently developed' in appellate briefs are waived on appeal.")

Here, Plaintiff failed to (1) state the elements of Listings 9.00 or 11.00 (or some sub-Listing under those) and identify which version applies to his SSI application,[10] or (2) cite medical evidence linked to arguments as to how the

_____

[10] The Listings related to diabetes mellitus have changed over time.
Compare Fillmore v. Astrue, 2012 U.S. Dist. LEXIS 12033, at *33 (N.D. Cal. Feb.

31

evidence shows he satisfied each element of a Listing.  Without such basic briefing, the Court cannot meaningfully analyze his claim of error.  Issue Five is therefore waived.

**F.      ISSUE ONE:  Hypotheticals Posed to the VE.**

　　　**1.      Summary of the VE's Testimony.**

The VE testified that Plaintiff's past relevant work consisted of two jobs: (1) light truck driver, classified by the Dictionary of Occupational Titles ("DOT") as medium work but light work as Plaintiff performed it, and (2) assembly work (scissors assembly), which was light and unskilled.  AR 81, 128.

The ALJ posed several hypothetical questions to the VE.  The first concerned a worker of advanced age with a "marginal education" who cannot speak English and with Plaintiff's work experience.  AR 129.  In addition, the worker had the same abilities as expressed in the assessed RFC, except no limitation on postural activities.  (Compare AR 129 and AR 44.)  The VE testified that such a worker could do both of Plaintiff's prior jobs, both as generally performed and as Plaintiff actually performed them.  AR 129.

The ALJ's second hypothetical was the same as the first, but it added a limitation for "occasional" postural activities, making it the same as the assessed RFC.  AR 129-30.  The VE gave the same answer.  AR 130.

The ALJ's third hypothetical was the same as the first, but limited the worker to lifting/carrying 20 pounds occasionally and 10 pounds frequently.  AR 130.  The VE testified that such a worker could perform the assembler job, both as regularly

─────────────

1, 2012) (discussing Listing 9.08) and Leveque v. Colvin, 2016 U.S. Dist. LEXIS 122595, at *7 (N.D. Cal. Sep. 9, 2016) (discussing Listing 9.00 and its instruction to "evaluate impairments that result from endocrine disorders under the listings for other body systems").

and as actually performed, and perform the truck driver job, but only as actually performed.  Id.

The ALJ's fourth hypothetical added additional restrictions, e.g., only lifting 10 pounds, using a cane, and no work requiring fine dexterity.  AR 130-31.  The VE testified that such a worker could not perform either of Plaintiff's prior jobs.  AR 131.

### 2. Plaintiff's Claim of Error.

Plaintiff does not contend that the hypotheticals posed to the VE did not accurately reflect the assessed RFC.  Rather, Plaintiff argues that the ALJ erred in assessing his RFC.[11]  (Dkt. 51 at 7 ["The ALJ erred in finding that [Plaintiff] could perform medium work, and substantial evidence does not support this finding."])  Plaintiff points out that in his prior SSI application, ALJ Dietterle found him capable of "less than a full range of light work" (referring to AR 145), and he did not "magically improve" between 2011 and 2013 to become capable of "medium" work.  (Id. at 7.)

Thus, the real question presented by Issue One is whether the ALJ's RFC assessment is supported by substantial evidence.  The Court addresses that question in Issue Six, below.

### G. ISSUE SIX: Plaintiff's RFC and Application of the Grids.

### 1. The ALJ's RFC Assessment.

Plaintiff contends that the ALJ erred by finding Plaintiff "capable of medium work."  (Dkt. 51 at 3-11.)  Plaintiff further contends that his RFC should have

---

[11] Plaintiff argues that the assessed RFC (and thus the ALJ's hypotheticals") should have "set forth his actual impairments."  (Dkt. 51 at 3.)  RFCs do not list medical impairments; they state the claimant's RFC, either in terms of restrictions against certain activities or maximum levels of exertion or frequency.  See, e.g., 20 C.F.R. § 404.1545 ("Your residual functional capacity is the most you can still do despite your limitations.").

included the need to use a cane, lower weight limits on lifting/carrying, lower durations for walking/standing, restrictions on fingering and handling due to numbness, inability to drive, restrictions on visual acuity, and the need for assistance to clean himself after toileting.  (Dkt. 51 at 4-6, 10.)

Throughout his argument concerning Issues One and Six, Plaintiff cites to his own testimony and medical records memorializing his subjective complaints to treating sources, all of which the ALJ was entitled to discredit, as discussed above in Issue Three.  (Dkt. 51 at 22.)  The Court considers below what other evidence exists concerning the limitations Plaintiff contends should have been included in his RFC.

a.     Use of a Cane.

On 6/6/11, the ER doctor observed Plaintiff was "ambulatory" with a "steady gait."  AR 402.  On 6/14/11, another doctor observed that he had "normal gait and balance" and did "not require the use of assistive devices for ambulation."  AR 471. On 6/30/11, a third doctor observed that his "posture and gait were unremarkable." AR 475.

The clinic's "Physical Assessment" forms for 4/24/12, 5/21/12, and 6/20/12 all checked "normal" for Plaintiff's musculoskeletal system.  AR 828, 831, 833.  On 8/28/12, "abnormal" was checked with the notation "ambulating c̄ [with] cane."  AR 827.

At the hearing in December 2012, Plaintiff brought a cane and testified that he used a cane both for "balance and because [he] need[s] the support."  AR 114-15. He testified that Dr. Llamas had recommended that he use a cane but did not prescribe one, so Plaintiff bought one.  AR 103.  He also testified that he could not use his right hand at all, then testified that he could use his right hand to hold the

cane and to write.[12]  AR 112-13.

Given the lack of medical evidence that Plaintiff required assistance to ambulate, substantial evidence supports the ALJ's decision not to include use of a cane in Plaintiff's RFC.

b.      Lifting and Carrying.

Dr. Ustaris opined that Plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently.  AR 473.  Drs. Schwartz and Scott opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently.  AR 488, 578-82.  The ALJ gave greater weight to Dr. Ustaris, the doctor who examined Plaintiff.  AR 44, 47-48.  The ALJ gave only "some weight" to the agency reviewing doctors, because they assessed exertional restrictions "too restrictive" in light of the "mild to moderate" objective evidence of impairment.  AR 48.

Plaintiff testified that he could not use his right hand to pick up a gallon of milk or a plate without dropping it.  AR 113.  "Every time he grabs something," he drops it.  AR 114.  Plaintiff, however, does not cite to any medical opinions concerning his lifting/carrying abilities.  The ALJ did not err by relying on the opinion of the consultative examiner, Dr. Ustaris.

c.      Walking and Standing.

Dr. Ustaris opined that Plaintiff could walk or stand six hours during an eight-hour workday.  AR 474.  Drs. Schwartz and Scott opined the same.  AR 488, 581.  Plaintiff does not cite any contrary medical opinions.

d.      Dexterity Restrictions.

Dr. Ustaris opined that Plaintiff had "no hand use impairment" and "no fine fingering manipulation impairment."  AR 474.  Drs. Schwartz and Scott also opined

---

[12] At the first hearing on October 7, 2008, Plaintiff testified that he is "not able" to hold onto a pen or pencil with his right hand.  AR 63.

that Plaintiff had "unlimited" handling and fingering ability. AR 489, 582. Again, Plaintiff does not cite any contrary medical opinions.

e.   Inability to Drive.

The record contains inconsistent evidence concerning Plaintiff's ability to drive. Plaintiff testified that in 2006, he could drive "only five miles, four miles" and by August 2010, he could not drive at all. AR 65, 84. He also testified, however, that he worked as a driver for four months around 2006 or 2007. AR 45. He was not let go because of any difficulty driving, but because he could not lift heavy china. AR 101-02. In 2011, he told Dr. Krieg that he still had a valid driver's license, but he did not drive alone (suggesting that he still drove, just not alone). AR 477. He did not tell her about his driving job with the furniture store and "denied being terminated from any job." AR 476-77. In 2012, the ER told Plaintiff not to "drive when taking Vicodin," but there are no other DMV or medical restrictions against driving in the record cited by the parties. AR 805, 810.

Given this record and the reasons cited by the ALJ for discounting Plaintiff's testimony, the ALJ did not err by failing to include a restriction against driving in Plaintiff's RFC.

f.   Visual Acuity.

Plaintiff claims that he suffers from blurred vision. (Dkt. 51 at 4, citing AR 616 [citing "chief complaint" section], 356 ["c/o (complains of) blurred VA [visual acuity)"], 543 [citing history from patient], and 676 [2012 ER record circled "visual loss" with note "gradual x 1 yr"].) Plaintiff points out that blurred vision is a documented symptom of uncontrolled diabetes. (Dkt. 51-2 at 8.)

The ALJ found, "Visual examinations revealed normal visual acuity and no diabetes-related visual impairments." AR 47, citing AR 492-93 and AR 571-72 (records from 2011 and 2012 referring to 2008 eye exam).

In 2008, Plaintiff had an eye exam which showed 20/25 vision in both eyes

when tested separately without correction, but 20/20 when his eyes were tested together.  AR 571.  An annual eye exam was recommended, but no such records are cited in the administrative record.  Id.  There was "no diabetic retinopathy on date of exam."  AR 492, 572.

In 2011, Dr. Ustaris again found deficits in both eyes when tested separately without correction, but found that Plaintiff had 20/20 vision when both eyes were tested without correction.  AR 471.  The agency reviewing doctors found no visual limitations.  AR 489, 582.  In March 2012, the ER referred Plaintiff to the eye clinic.  AR 702.  There are no records of later treatment at the eye clinic and no evidence that Plaintiff has ever worn glasses.

Thus, substantial evidence supports the ALJ's decision not to include limitations on visual acuity in Plaintiff's RFC.

g.     Toileting Assistance.

Plaintiff gave the following testimony about toileting assistance:

Q. Do you have problems going to the bathroom?

A. Yes.

Q. What problems do you have going to the bathroom?

A. Every time he goes to the bathroom – when he has to go to the bathroom, he can't go normal.

Q. Okay.  What about cleaning yourself up after using the restroom?

A. That's what he can't do.

Q. Okay.

A. He always washes.

Q. Okay.  Does your wife have to help you there?

A. To take a shower, yes.

AR 118.  Plaintiff argues that this impairment alone is disabling.  Dkt. 51 at 6, citing "Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1096 (9th Cir. 2014) (Vocational expert testified that having to shower or clean up twice weekly after

37

toiling or otherwise being an olfactory nuisance would preclude employment.).”

The only evidence that Plaintiff has problems using the bathroom is the above-cited the testimony. He first testified that he "can't go normal," which suggests a bowel issue. When the ALJ mentioned cleaning himself, he testified that he cannot, but then he testified that "he always washes," suggesting he uses a wipe or wet cloth rather than just toilet tissue. AR 118. He testified that his wife helps him shower, not that his wife helps him clean himself after toileting. <u>Id.</u> In all the records of Plaintiff attending consultative examinations, ER visits, clinic visits, and multiple ALJ hearings, Plaintiff cites to no record where anyone noted that Plaintiff could not use the toilet independently or created an "olfactory nuisance."

The ALJ did not err in concluding that the above-cited testimony was not substantial evidence requiring toileting-related restrictions in Plaintiff's RFC.

## 2. Other Alleged Error at Steps Four and Five.

Plaintiff contends that the ALJ should have applied the Medical Vocational Guidelines (i.e., the Grids) which, based on his age, would dictate that Plaintiff is disabled if he can only do light work. (Dkt. 51 at 6, 35.) The Commissioner correctly points out that the Grids only apply at step five, which the ALJ did not reach because he found Plaintiff "not disabled" at step four. (Dkt. 51 at 31, citing <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100-02 (9th Cir. 1999).) Moreover, the ALJ found Plaintiff capable of more than light work, as discussed above.

Plaintiff next contends that the ALJ erred when he concluded at step four that Plaintiff could do his past relevant work as a light truck driver or assembler. (Dkt. 51 at 9.) As to both jobs, Plaintiff contends that the RFC does not account for his limitations on handling things and driving. (<u>Id.</u> at 10.) As discussed above, substantial evidence supports the ALJ's RFC assessment.

Specific to driving, Plaintiff contends (1) that job "may not even constitute past relevant work," and (2) he performed that job at the sedentary level. (<u>Id.</u> at 9-10.) Contention (1) fails to show reversible error, because Plaintiff's counsel

stipulated that Plaintiff's driving job was substantial gainful activity. AR 122. Contention (2) fails to show reversible error, because the ALJ opined that Plaintiff could work as a light truck driver as that job is described in the DOT (i.e., at a medium exertional level), and the ALJ relied on that testimony. AR 49, 130.

**H.**     **ISSUE SEVEN: Payment of Benefits.**

Having found no legal error, Issue Seven is moot.

**VI.**

**RECOMMENDATION**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; and (2) directing that Judgment be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

Dated: <u>October 19, 2018</u>

KAREN E. SCOTT
United States Magistrate Judge